UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | Criminal No.   05-387 (RWR) |
| v. | : | |
| | : | |
| **ALFREDO MEDINA,** | : | |
| | : | |
| a/k/a Jose Soto, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's Motion to Suppress Evidence and Statements. In support of this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing regarding these motions.

**I.      Factual Background**

The defendant is charged in a two count indictment with Unlawful Possession with Intent to Distribute 500 Grams or More of Cocaine and Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. § 2, and Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1).

At a hearing or trial in this matter, government counsel expects the evidence for this charge to demonstrate substantially as follows: Approximately one week prior to September 27, 2005, Michael Luna advised the defendant that he knew an individual who wanted to purchase kilogram quantities of cocaine. The defendant advised Luna that he knew someone who could provide kilogram quantities of cocaine. On September 27, 2005, Michael Luna exchanged several phone

calls with a confidential informant (CI), during which Michael Luna agreed to arrange the sale of two kilograms of cocaine to the CI for approximately $20,000 per kilogram. Luna then contacted the defendant and advised him that the CI wanted to purchase two kilograms of cocaine, and the defendant agreed to obtain the cocaine for the transaction.

Luna arranged to meet the CI at the Burger King located xxx xxxxxx xxxxxx xxxxxxxx, Washington, DC, at approximately 7:30 pm, for the purpose of brokering the cocaine transaction between the defendant and the CI. Luna and the defendant then traveled to the Burger King in the defendant's Ford Expedition. Shortly before 7:30 pm, the CI met with Luna and the defendant in the parking lot of the Burger King, while law enforcement personnel observed the meeting. The CI eventually entered the defendant's Expedition at which time the CI and the defendant began to negotiate the price for the purchase of two kilograms of cocaine. Once the price was agreed upon the defendant made a telephone call to co-defendant Adalberto Flores, and advised Flores to bring the cocaine to the Burger King Parking lot. A short time later, Flores entered the parking lot driving a Dodge Intrepid.

Once the Dodge Intrepid driven by Flores was parked in the lot next to Expedition the CI gave a signal to the arrest team to move in and arrest the suspects. The defendant was stopped by the arrest team siting in the driver's seat of the Ford Expedition. The defendant was removed from the vehicle, and prior to being placed in handcuffs, was asked if there were any weapons in the vehicle or on his person. In response, the defendant advised the officer that there was a firearm under the floor mat of the driver's seat. Officers recovered a Glock .357 semi-automatic pistol from underneath the driver's front floor mat. Also recovered from the Expedition were two cellular telephones, a car charger, and assorted paperwork located inside the glove box. A search of the

Dodge Intrepid recovered a DVD box containing two wrapped packages containing a white powder substance, which field tested positive for cocaine. Each package weighed approximately 1,200 grams. A search of co-defendant Flores incident to arrest recovered a cellular telephone, identification card, and paperwork.

After the defendant was arrested and transported to the police station he provided a videotaped interview to Det. Steve Manley. The defendant was advised that the interview would be videotaped. Det. Manley questioned the defendant regarding the events which led to his arrest, but had forgotten to advise the defendant of his <u>Miranda</u> rights. The defendant was interviewed for approximately ten minutes before Det. Manley realized that he had failed to <u>Mirandize</u> the defendant. At this point, Det. Manley stopped the interview, obtained a PD-47 rights card, and advised the defendant of his <u>Miranda</u> rights on videotape. The defendant then executed a waiver of his rights and agreed to answer questions without an attorney present.

Prior to being <u>Mirandized</u> the defendant stated that the vehicle that he was driving at the time of his arrest belonged to an individual named "Tony." The defendant claimed that the gun found in the vehicle was not his, and that he only realized the gun was inside the vehicle after he started driving the vehicle. The defendant also claimed that he did not know how the gun got into the vehicle. The defendant stated that he met his friend Michael (Luna) in Silver Spring, Maryland, and that Michael told him that he had to meet a friend in Washington, DC. The defendant stated that he drove Michael to the Burger King in Washington, DC, and that he did not know the reason why Michael wanted to go to the Burger King. The defendant also claimed that he did not know the individuals who were arrested sitting in the Dodge Intrepid.

After the defendant was <u>Mirandized</u> and executed a waiver of his rights he stated on video that he never spoke to Michael's friend (the CI). The defendant stated that once they met Michael's friend in the Burger King parking lot he overheard the friend tell Michael he wanted to purchase cocaine. He also said that Michael told his friend that he wanted to see the money, and that Michael's friend then stated that he wanted to see the cocaine. The defendant claimed that he did not know how much cocaine Michael and his friend were discussing. The defendant admitted that he was in the process of trying to purchase the Expedition from an individual named "Tony." The defendant further admitted that he had touched the gun that was found underneath the driver's floor mat. The defendant stated that he had never seen large amounts of cocaine before, and that he had never seen the individuals who were arrested driving the Dodge Intrepid before that day.

The videotaped interview was then terminated and the defendant was returned to the cell block. After conducting an interview with co-defendant Michael Luna, Det. Manley returned to the cell block and the defendant advised that he had additional information that he wished to provide. At the defendant's request, this portion of the interview was not recorded, although Det. Manley drafted a summary of the defendant's statement. The defendant advised Det. Manley that he had previously been approached by Michael Luna, who told him that he was trying to obtain two kilograms of cocaine for an associate. The defendant stated that he told Luna that his supplier, named "Guman," could supply the cocaine. The defendant advised that while he and Luna were together on September 27, 2005, Luna received a call from his friend who wanted to purchase the cocaine, and that Luna agreed to meet him at the Burger King located at xxx xxxxxx xxxxxx xxxxxxxx, Washington, DC.

The defendant stated that when he and Luna arrived in the Burger King parking lot Luna called his friend and told him that they had arrived at the parking lot. The defendant stated that Luna's friend then arrived in a white pick-up truck and parked near their vehicle. The defendant stated that Luna exited his vehicle and walked over to his friend and they began talking. Luna then returned to the defendant's vehicle, and shortly thereafter Luna's friend walked over and sat in the rear passenger seat of the defendant's vehicle. The defendant stated that Luna and his friend then began to negotiate a price for the two kilograms of cocaine. The defendant stated that Luna's friend then exited the vehicle, and he (defendant) placed a call to Flores, who was the driving the Dodge Intrepid, which was parked at a nearby Wendy's. The defendant admitted that he instructed Flores to bring the two kilograms of cocaine to the Burger King. The defendant stated that after Flores arrived in the parking lot they were all arrested.

Defendant filed a motion to suppress the evidence seized at the time of arrest and a motion to suppress oral and written statements asserting, <u>inter alia</u>, that the search and seizure at the time of arrest were "unlawful" and "unconstitutional," and that the statements made by the defendant were obtained in violation of <u>Miranda</u> and were otherwise provided involuntarily.

## II.   **The officers had probable cause to arrest the defendant and the search was valid as incident to a lawful arrest**

It is axiomatic that the police may arrest someone without first obtaining an arrest warrant where the police have probable cause to believe that person is committing or has committed a criminal offense. <u>Florida v. White</u>, 526 U.S. 559, 565 (1999). Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his or her training and experience, that would lead the officer to believe that a criminal

offense had been or is being committed. See United States v. Green, 670 F.2d 1148, 1151 (D.C. Cir. 1981); Brinegar v. United States, 338 U.S. 160, 175 (1949). In the instant case, the officers were conducting a controlled purchase of cocaine through the use of a confidential informant. This transaction had been arranged through an earlier recorded phone conversation between the informant and one of the defendant's co-conspirators, Michael Luna. In addition, the information that the officers received from the informant that the narcotics transaction had been successfully negotiated and that the cocaine had arrived in the parking lot was corroborated by the officers' own independent observations of the activities of the informant and the defendants. Accordingly, the arrest of the defendant was lawful and the search of his person was valid as a search incident to his arrest. See United States v. Robinson, 414 U.S. 218, 224 (1973); Chimel v. California, 395 U.S. 752, 763 (1969).

Furthermore, the defendant was arrested while he was sitting in the driver's seat of the Ford Expedition. Therefore, the search of the Ford Expedition was also valid as a search incident to arrest. See New York v. Belton, 453 U.S. 454, 460 (1981) (holding that a search of a vehicle contemporaneous with a lawful arrest of a vehicle occupant may include the passenger compartment as well as any containers, whether open or closed, found therein). Under the same reasoning, the search of the Dodge Intrepid was also valid as a search incident to arrest, as defendant Adalberto Flores was arrested while sitting in the driver's seat of that vehicle.

### III. Defendant's Statements

As stated above, the defendant's arrest was lawful. Accordingly, there is no basis to suppress his statements as the fruit of an illegal arrest. The defendant argues that any statements made by him were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), or otherwise made

involuntarily in violation of Lego v. Twomey, 404 U.S. 477, 489 (1972). Under Miranda, custodial interrogation automatically triggers numerous procedural safeguards to protect an individual's Fifth Amendment right against compulsory self-incrimination. As explained in Miranda, custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. The Court has stressed that these safeguards come into play only when the defendant is subject to both custody and interrogation. Rhode Island v. Innis, 446 U.S. 291, 297 (1980); Beckwith v. United States, 425 U.S. 341, 347 (1975). Thus, in the absence of either factor, Miranda safeguards do not apply.

The first statement made by the defendant was at the time of his arrest when he advised the arresting officer that there was a gun underneath the driver's front floor mat. This statement was made in response to the police officer's question of whether the defendant was aware of any weapons on his person or inside the vehicle. At the time the defendant made this statement he was not free to leave the scene and was about to be placed under arrest. Accordingly, the defendant was in police custody at the time he made this statement.

In New York v. Quarles, 467 U.S. 649 (1984), the Supreme Court held that "Miranda warnings need not precede 'questions reasonably prompted by a concern for the public safety,' or the safety of the arresting officers." United States v. Reyes, 353 F.3d 148, 152 (2d. Cir. 2003) (quoting, Quarles, 467 U.S. at 656, 658-59). The so called "public safety" exception to the Miranda warnings requirement was carved out with the purpose of allowing "officers 'to follow their legitimate instincts when confronting situations presenting a danger to public safety,' because

'spontaneity . . . is necessarily the order of the day.'" Reyes, 353 F.3d at 152 (quoting, Quarles, 467 U.S. at 656).

The D.C. Circuit does not appear to have addressed the applicability of the public safety exception under circumstances similar to the instant case.[1] Numerous other circuits have taken up this issue and held that the public safety exception does apply to pre-Miranda custodial police questioning under circumstances similar to the instant case.

In Reyes, police arranged for a confidential informant (CI) and an undercover officer to meet Reyes at a bodega for the purpose of conducting a controlled purchase of heroin. Reyes, 353 F.3d at 150. Once the CI got into Reyes' vehicle and observed the narcotics police moved in and arrested Reyes. Id. Prior to placing Reyes in handcuffs or reading him Miranda warnings, the arresting officer asked Reyes if he had anything on him that could hurt the officers. Id. Reyes responded that he had a gun in his pocket, at which time the officer recovered a pistol from his pocket. Id. The officer then handcuffed Reyes, and prior to conducting a search of his person, asked him whether

---

[1] The United States District Court for the District of Columbia has on at least one occasion addressed the Miranda issue in a case involving similar facts. In United States v. Gorrell, 360 F. Supp.2d 48 (D.D.C 2004), the police conducted a traffic stop during which the driver was found to be driving on an expired permit. Id. at 51. The officer placed the driver under arrest, and "asked him if he had anything 'she should know about.'" Id. The driver then told the officer that he had drugs inside his pocket. Id.

Judge Leon ruled that the statement was admissible, because the officer asked a "nonspecific question" that was not "reasonably likely, under the circumstances to elicit an incriminating response." Id. at 53. Judge Leon held that the defendant's statement was therefore not "the product of an interrogatory question" requiring Miranda warnings. Id. at 54. This decision did not address the applicability of the public safety exception to such circumstances. Furthermore, the facts of the instant matter demonstrate a greater security threat to the officers and the public then existed in the Gorrell case. The instant matter is also distinguishable to the extent that the officer asked the defendant a more specific question than was asked in Gorrell, to wit, whether there were any weapons on him or in the vehicle.

8

he had anything in his pocket that could hurt the officer. Id. at 151. Reyes responded that he had narcotics inside the vehicle. Id.

The Second Circuit held that the statements made by Reyes were admissible under the public safety exception set forth in Quarles, because the under the circumstances the questions were reasonably prompted by a concern for safety. Id. at 154. The court then noted several factors which demonstrated the need for the questioning, including: (1) Reyes was a known narcotics dealer; (2) the arrest took place in a public place, thereby increasing the danger to the public; (3) firearms and sharp objects such as razor blades and needles are "tools of the drug trade" which are regularly found on narcotics traffickers; and (4) the officers received information from the CI that Reyes carried a firearm. Id. The court also noted that the arresting officer's questions were limited in scope and were not posed to elicit incriminating evidence. Id.

In addition to the Second Circuit, several other circuits have applied the public safety exception under circumstances similar to the instant case. See United States v. Lackey, 334 F.3d 1224, 1227, 28 (10th Cir. 2003) (upholding police question of shooting suspect as to whether he had any guns, sharp objects, or anything that could hurt the officer because questions "addressed a real and substantial risk to the safety of the officers and were not designed to acquire incriminating evidence); United States v. Williams, 181 F.3d 945, 953-54 (8th Cir. 1999) (holding that statement of accused that there was gun in the closet was admissible under the public safety exception where the defendant was arrested inside his residence during execution of a search warrant and placed in handcuffs, and subsequently asked by police if there was anything the police needed "to be aware of"); United States v. Shea, 150 F.3d 44, 48 (1st Cir. 1998) (holding that defendant's answer to agent's question of whether he had any weapons was admissible under public safety exception where

defendant had been apprehended as a suspect in an armed bank robbery); United States v. Carillo, 16 F.3d 1046, 1049-50 (9th Cir. 1994) (questioning whether narcotics defendant had needles on his person, asked as a matter of routine rather than as a result of specific information regarding the defendant, stemmed from objectively reasonable concern for officer safety); Fleming v. Collins, 954 F.2d 1109, 1111, 1114 (5th Cir. 1992) (upholding questioning of suspected bank robber regarding whether he had any weapons); United States v. Edwards, 885 F.2d 377, 384 and n.4 (7th Cir. 1989) (upholding questioning of suspected narcotics dealer as to whether he was armed because drug dealers are known to carry weapons and officers had objectively reasonable need to protect themselves even though defendant had already been handcuffed and frisked); but see, United States v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994) (holding as inadmissible statement made by defendant in response to police questioning about whether there was anything in the apartment that could be a danger to the agents, where defendant was naked at the time search warrant was executed, security sweep of premises had been made prior to questioning, and defendant was found to be sole occupant); United States v. Raborn, 872 F.2d 589, 595 (5th Cir. 1989) (declining to apply public safety exception to police questioning of defendant regarding where he had stashed a gun, where police saw defendant with a gun before he placed it in his vehicle and questioning occurred at a time where defendant's truck was under police control).

  Based upon the legal authority summarized above, the defendant's statement to police at the time of his arrest should be admitted under the public safety exception to the Miranda requirement. At the time the police moved into arrest the defendant there were at least three other people in two separate vehicles that the police had to secure, and the arrest occurred in the parking lot of a Burger King Restaurant. Furthermore, the police were conducting an arrest in connection with the

controlled purchase of two kilograms of cocaine. Accordingly, it was reasonable for the police to believe that the defendant or his confederates were armed, because of the frequency with which narcotics dealers are known to carry weapons to protect themselves. All of these factors demonstrate that the police questioning of the defendant at the time of his arrest was based upon an "objectively reasonable need" to protect themselves and the public from potential danger.[2]

The additional statements made by the defendant occurred at the police station pursuant to police questioning. As an initial matter, the government concedes that the pre-Miranda statement made by the defendant during the videotaped interview was obtained in violation of Miranda, and therefore inadmissible in its case-in-chief. However, pursuant to the legal authority discussed below, the government reserves the right to use this statement in its rebuttal case because the statement was made voluntarily.

The statements made by the defendant after he was Mirandized should be admitted as statements made pursuant to a knowing and voluntary waiver of his rights. In the Supreme Court's recent decision in Missouri v. Seibert, 542 U.S. 600 (2004), the Court addressed the admissibility of a confession obtained in violation of Miranda during an earlier interview, and then repeated by the accused in a later interview after Miranda warnings had been properly administered and a waiver

---

[2] Defendant also requests suppression of any evidence obtained as the fruit of his statements. As discussed below, all of the defendant's statements were made voluntarily and were not the product of coercion by police. Accordingly, there is no basis to suppress any evidence which could be construed as obtained as the fruit of statements made by the defendant. United States v. Pantane, 542 U.S. 630, 643 (holding that "fruit of the poisonous tree" doctrine does not apply to physical evidence recovered based upon voluntary statements obtained in violation of Miranda). In addition, the firearm recovered from the Expedition would be admissible pursuant to the "inevitable discovery" doctrine, because the police were authorized to conduct a search of the Expedition incident to the defendant's lawful arrest. See United States v. Gale, 952 F.2d 1412, 1416 (D.C. Cir. 1992).

11

executed. In Seibert, the interrogating officer admitted that he purposefully questioned the accused without giving the proper warnings in order to elicit incriminating statements, with the expectations that he would obtain the same confession later after proper Miranda warnings had been given. Id. at 605-606. In Seibert, the accused did in fact provide a confession pursuant to custodial interrogation without receiving prior warnings, and then repeated the confession in a later interview after she had been properly advised and had executed a waiver. Id. at 605.

The Supreme Court held that both the earlier confession obtained in violation of Miranda and the later post-Miranda statement were inadmissible, because the post-warnings statement was obtained under circumstances "seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." Id. at 617. In evaluating the efficacy of Miranda warnings provided under such circumstances, the Court looked to several factors, such as:

> The completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 616. The Court then went on to distinguish the facts of Oregon v. Elstad, 470 U.S. 298 (1985), in which the post-Miranda statement was held admissible, noting that in Elstad the questioning at the station house was a "markedly different experience from the short conversation" at the accused's home, which could be viewed as a "new and distinct experience." Id. Conversely, the facts of Seibert consisted of a "police strategy adapted to undermine the Miranda warnings," involving station house questioning that was "systematic, exhaustive, and managed with psychological skill,"

and the warned phase of the questioning was conducted only 15 to 20 minutes later with no advisement of the accused that the earlier statement could not be used at trial. Id.

The facts of defendant Medina's interrogation present a much different factual scenario then seen in Seibert. First, the videotaped interview demonstrates that the failure to Mirandize the defendant was inadvertent, as opposed to a purposeful strategy calculated to undermine Miranda.[3]

The fact that the Miranda violation occurred during a videotaped interview provides compelling evidence of the absence of any intent on the part of the officer to engage in interrogation techniques designed to frustrate Miranda. Furthermore, the videotaped interview demonstrates that the defendant was only interviewed for approximately ten minutes before Det. Manley realized the error and administered the warnings. Det. Manley also advised the defendant at the start of the interview that the interview was being videotaped. These facts demonstrate that the failure to administer warnings before questioning was inadvertent.

Secondly, the pre-warning interview lasted only ten minutes, and the nature of the questioning was to allow the defendant to tell his side of the story. The defendant was not subjected to "exhaustive, systematic" questioning, where once the police "were finished there was little, if anything, of incriminating potential left unsaid." Id. In fact, the bulk of the defendant's videotaped interview, both pre and post-Miranda, consist of exculpatory statements or statements calculated to minimize the defendant's role and knowledge of the offense. As demonstrated by the videotape, after Det. Manley realized that warnings had not been administered the interview was immediately stopped and warnings provided. Det. Manley can be heard to advise the defendant that he had not

---

[3] The plurality in Seibert noted that the subjective intent of the interrogating officer should not be the focus of the reviewing court's inquiry, but rather the "focus is on facts apart from intent that show the questioning-first tactic at work." Seibert, 542 U.S. at 616, n.6.

been advised of his rights, and that failure to do so was a mistake. The video also establishes that the defendant was advised of his rights, after which he executed a waiver by signing the PD-47 rights card. It was at this point that the interview was continued.

Approximately 20-25 minutes after the videotaped interview was terminated and the defendant was brought back down to the district cell block, the defendant spontaneously advised Det. Manley that he wanted to provide additional information. This interview was not recorded, because the defendant would not agree to be interviewed on tape.[4] The defendant then advised Det. Manley, that, among other things, he agreed to obtain two kilograms of cocaine for co-defendant Luna to sell to the informant. The circumstances surrounding the making of these additional statements indicate that the defendant, independent of any police action, requested the opportunity to provide additional statements to police at a time when he had been advised of his rights and had voluntarily waived these rights. Based upon the standards set forth in Seibert and Elstad, the post-Miranda statements made by the defendant should be admitted, because they were made under circumstances where the defendant was fully capable of comprehending his right to remain silent, and making a voluntary decision to waive that right.

A statement is voluntary for purpose of due process so long as the statement is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (citing Columbe v. Connecticut, 367 U.S. 568, 602 (1961)). Moreover, for a statement to be involuntary, it must have been caused by government overreaching. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986) ("[a]bsent police conduct casually related to the confession,

---

[4] The defendant was not re-advised of his rights at the time the second interview was conducted.

there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). There is no indication of such conduct in this case. Moreover, even if there were, there is no indication in this case that under the totality of the circumstances, Lego v. Twomey, 404 U.S. at 489 (government has burden of establishing under preponderance of the circumstances that the confession was voluntary), defendant's will was overborne. See Rogers v. Richmond, 365 U.S. 534, 544 (1961) (government conduct must be "such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined").

In order to determine whether a statement was voluntarily made, the court must examine the totality of circumstances to determine whether an individual's "will has been overborne and his capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. at 225; Harris v. Dugger, 874 F.2d 756, 759-62 (11th Cir.) (confession voluntary even though defendant in forearm cast and handcuffed during six-hour interrogation), cert. denied, 110 S. Ct. 573 (1989); United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (promises that cooperation would be communicated to prosecutors insufficient to overcome will); United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988) (defendant's seasickness, his uncomfortably hot room, and his unfamiliarity with American legal culture not a legally adequate basis for concluding that confession was involuntary); United States v. Pelton, 835 F.2d 1067, 1072-73 (4th Cir. 1987) (FBI agent's assertion that would launch full-scale investigation if defendant did not cooperate not sufficient to render statements involuntary), cert. denied, 486 U.S. 1010 (1988). Testimony at a pre-trial hearing in this case will demonstrate that the statements made by the defendant were voluntary.

WHEREFORE, the government respectfully requests that the Court deny defendant's motion.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
BAR NO. 451058

_____
STEVEN B. WASSERMAN
ASSISTANT UNITED STATES ATTORNEY
D.C. BAR NO. 453-251
FEDERAL MAJOR CRIMES SECTION
555 4TH Street, NW, Room 4241
Washington, DC 20001
(202) 307-0031

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Government's Memorandum In Opposition to Defendant's Motions to Suppress Evidence and Statements is to be served upon counsel for the defendant, Luiz Simmons, Esquire, this 3rd day of January, 2006.

_____
STEVEN B. WASSERMAN
ASSISTANT UNITED STATES ATTORNEY